Good morning, Your Honors. May it please the Court, my name is Howard King along with Counsel Stephen Rothschild and Jeff Mousner. I represent Perfect Ten. I hope to be able to reserve about eight minutes of my time for rebuttal. This is an appeal of a 12b-6 dismissal where the District Court summarily determined that there could be no sets of facts under which the plaintiff could prove any of its claims. We believe that this erroneous decision ignores many of the plaintiff's specific allegations, including allegations that, in spite of repeated notices from Perfect Ten, defendants have chosen to continue to fund and take a piece of the sale of virtually all of the stolen Perfect Ten merchandise sold over the Internet, and that these defendants continue to provide virtually all of the revenue necessary to fund the criminal activities of hundreds of impossible-to-find infringers around the world. Mr. King, I think you've indicated in your very well-written brief that stopping the claims would basically end the infringement action, or end the infringement by third parties, and that the same process establishes vicarious liability. How is that any different, though, than, say, the electric company that provides the power for the computers to run, or like in the Napster and Grotzker cases, the advertisers that make it possible for them to function? What's the difference? Well, I think there are at least ten specific differences that we've identified. Give us a few, I think. I'll give you my top five. The utilities don't knowingly fund illicit transactions and take a piece of the profit. How do you know? Well, we have alleged that that's a difference, and we know that... I mean, I don't know if some utility knows about some merchant that is doing an illegal activity. I do know... What if you send them a DCMIA notice? Pardon me? What if you send them a DCMIA notice? Well, in fact... If you send them to a utility company and say, you know, you've got a server in Monrovia, and on that server there are all these pictures that belong to us. We want you to cut off the electricity so the server will go down. And here's exactly where they are. Right. I don't believe that the utility in that circumstance would have the necessary nexus to the material contribution and the right and ability to control that would provide for either contributory or vicarious liability. Sounds like Mrs. Palsgraf, huh? Well, we don't know why the scale fell on Mrs. Palsgraf. You're talking proximate cause, really, aren't you? It's too far removed somehow? Well, I don't believe it's a torrid concept, but I believe that there is a world of difference between the involvement of a benign utility providing the service that everybody needs and a credit card process... An evil credit card company, a benign... Well, in the pejorative comment, you have credit card companies that pick and choose who their merchants are going to be. They have a qualification process. Their rules and regulations require that they inspect the business of those merchants. The rules and regulations require that they continually monitor the websites of internet merchants to make sure they're not committing an illegal activity. What about advertisers, though? Let's get away a little closer. These advertisers that were dealt with in Napster and Groxter, I guess the way it's said, they specifically target this population, the people who are interested in going to your sites. And yet, are you suggesting that they're responsible? Those cases didn't find them responsible. Well, with due respect, the advertisers weren't... the person sought to be held secondarily liable in those cases. Right. So I could posit a hypothesis where an advertiser might be liable... But they weren't found to be liable, right? Right. Nor do I think they should be. I mean, again, we have credit card companies here who are taking... who are in the virtual room every time a transaction takes place and are giving an approval. It's like having Johnny who wants to buy stolen goods saying to a credit card processor, I'd like to borrow money to buy these stolen goods. The credit card processor looking at the transaction and saying, we'll loan you the money, we'll turn around and give the money to the person we know is infringing, taking a nice fee for ourselves. And as we've alleged at this initial stage, without that participation, the transaction does not occur. You said, you know, you use sort of real world terms like they're in the room. Right. But are they in the room? I don't know how this stuff works, except I guess based on many experiences I've had in buying things on the internet. Not your client, by the way. It's just that I don't really care about this. But L.L. Bean and eBay and all those things of that sort. And I don't know what the... Let's say you can use your American Express card. I have no idea what American Express knows about a transaction. What I have always assumed happens is it's just like going into a store. They check the number I give them and the secret code and amount to make sure that they match my name and address and it doesn't go over my credit limit. And I've paid my bill on time, you know, all those things. But they don't know what I'm buying, do they? Well, the interesting... I mean, are they really in the room there? When you go to a store, supermarket, and you use your credit card, or a department store, the credit card company is not there to look over the things you're buying. Let me answer that two ways. First is, we're at the pleading stage, and that precisely illuminates the problem we have here. We have alleged that, indeed, they are in the room. Now, of course, the transaction takes place in a millisecond. So the benefits of modern technology have allowed credit card processors to greatly increase their income and their efficiencies by doing it in a millisecond. But the fact of the matter is that the plaintiffs have alleged that for every transaction, there is an approval process by which the buyer's request to borrow money goes through the chain of the various dependents, the processors, Visa, and then approval comes down before Visa, through its processor, says, okay, we'll loan the money, and turns to the merchant and says, we'll give you the money minus our cut. And part of that process is, indeed, knowing who their merchant is and what they're selling. So if it's your position, and you say you're alleging a senior complaint, that when they process a transaction, they not only know the amount, but they know what's in your basket. Absolutely. That is absolutely our allegation. I mean, that's what you allege. Right. And that's, in fact, why credit card companies, for instance, take steps to not fund sales of child pornography. This is why they take steps to not fund gambling transactions. I mean, they're not the utility company who gives service to anybody who asks for service. That's quite different from what happens in the brick-and-mortar world. If I go to a restaurant and I order a nice bottle of wine and dinner for myself or my wife and dessert and whatnot, the bill I get back may say, you know, this was much more charged. It may break out the tip. Right. But I don't assume that American Express knows whether I had 12 grand or not. They probably know you had a diner. Or an inherent species of some kind. Heaven for a friend. What they do know is who the merchant was. Right. They have monitored that merchant to make sure that merchant is not selling, you know, shark as Colombian sea bass, and they know that you had a dining experience there. But, counsel, if you take what you're proposing here, the credit card world, the commercial world as we now know it, radically changes, if not disappears. I mean, a Home Depot may have all kinds of illegalities in products that they sell. Or the supermarket may have workers who are not properly documented or were hired after a strike or things like that. And what you're, in essence, saying is that the credit card companies become police to, in effect, cover every transaction that is handled in milliseconds. If they don't monitor those, that they could somehow be jointly liable. We're talking now in this context. But could it not be in any other context if we follow your line of thought? Well, my line of thought is based upon specific laws relating to secondary liability for copyright infringement. I understand that. And it goes to, under contributory, the materiality of the contribution. Could I come up with a hypothesis where Visa could be liable for Home Depot selling, you know, defective lumber? I don't think so. But that's not the situation. Again, what we have alleged is a very specific prior knowledge, again, which has not been questioned for purposes of pleading. Prior knowledge that the transactions they're going to specifically fund are an infringing transaction. And we've alleged that without their funding, the transaction cannot go forward because there is no alternative in the Internet, as there might be at a Home Depot where you can write a check or you can, you know, pay them in cash. This is the medium of exchange in the Internet. It's the credit card processors. And to find otherwise, to sustain the lower court's ruling at this pleading stage grants the credit card companies absolute immunity for anything they would do going forward in the copyright area. Because I can't imagine that anyone could plead more specific facts than we have as far as the materiality of the contribution and the right and ability to control the transaction. So you give blanket immunity to one industry not available to any other industry in the country for secondary copyright infringement if you sustain the lower court's ruling. Is it your position that the entity they deal with, that the credit company deals with, the company or whatever it is, that the credit card company cannot deal with them if they engage in some illicit activity? Or does it have to be all their business be illicit or a substantial part? Or do you have, what's your definition? How would you limit that? Well, again, we haven't had the opportunity to develop the record. But the ultimate question will be is how material is the contribution of the credit card companies to the infringements that are taking place? We've alleged... I mean, suppose it's a business that infringes one out of every 500 transactions. Under that hypothesis, I would say that's probably not material. That's probably an innocent error. But that's not what we've alleged here. I mean, we've alleged that they... But if they engage in both infringing and non-infringing transactions, and the infringing transaction is a portion of their business, are the credit companies then prohibited from dealing with those entities? I believe it would go to the issue of knowledge and materiality. First, how much knowledge do the credit card companies have that this particular merchant is engaging in substantial copyright infringement? Secondly, is the materiality of the contribution? And, again, the credit card companies have the right, under their regulations, to not process an infringing transaction or terminate a merchant who's engaging in substantial violations of law. I guess this gets to the other end of the lawsuit, the remedy. And, I mean, this is in part in answer to Dr. Reinhart's question. What are you seeking in the end? Are you seeking damages? Are you seeking the ability to send them a notice saying, this merchant you're dealing with has the following images, let's say, on their server, and we want you to stop doing business with them? Or you want to force them to take the images of others? What exactly is the relief you're seeking? Well, the primary relief, of course, is to stop them from funding these rampant infringers, which would be exactly that, providing them with unequivocal notice. That's the bottom line. What I'm really asking is, what is it that the court can order? What is it that you're seeking by way of a remedy? I mean, one remedy could be saying, keep doing what you're doing or damages. That's one remedy. The other one would be, we want to be able to force them to stop doing business with somebody who has, and that gets into Judge Reinhardt's question, what if the merchant does partly legitimate business and partly illegitimate business? Can you force them to stop doing business or servicing the merchant? The other remedy might be to say, here's a list of infringing products that they're selling on this website. Either we want you to order or require the website to take these images off, or we require you, if it ever gets a transaction involving one of these images, you'll decline the transaction. I'm trying to get to the specifics. I appreciate that. Because all of these remedies involve a different level of involvement and the question of whether some are legitimate and some are illegitimate transactions depends a lot, the distinction matters a lot less if all you're trying to get is the ones that are illegitimate. The primary remedy sought is the ability to enjoin the credit card companies from funding rampant copyright infringers, people, serial infringers of my clients' copyrights. But you're not contending that the credit card companies have the right to remove specific infringing material, are you? We've absolutely alleged that they do have the right. In fact, I don't think that's contested, that their rules and regulations give them the right. To actually, if you will, monitor what's on there. They have the right, according to your allegation, to not pay, in other words, to terminate the credit card relationship. But I'm asking about do they have the ability under the contract to actually monitor what's on the site? Not only do they have that ability, they have a broader ability. Visa and MasterCard regulations require the processors, the other defendants in this case, to affirmatively monitor the websites, especially of what they call the high-risk merchants we're dealing with here, and make sure that infringing materials and any other legality is removed, and that ultimately a serial violator of their rules gets put on the industry blacklist called the match list. Again, something far different than a utility company. That's a third party. They have the ability to make a third party monitor, right? No, no, one of the defendants. The defendants. Again, there's three classes. You know, Judge Smith asked you an important question, and you missed the opportunity to say yes. Okay. If you meant yes. Well. It's always dangerous to sort of give a complicated answer when asked a simple question. Yes, you're right. And I really would have wanted to know the answer to that question. Yes, they have the right and ability to do exactly what Judge Smith suggested. Under their contract. And that's the rest of your complaint? Absolutely. Okay, I'm sorry. You can have the rest of your answer if you want. Well, no, I'm happy. If I've made Your Honor happy, I've made myself happy. In one of the last two minutes, I will remind the court of the Fonavisa decision, which was a Ninth Circuit case, the swap meet case, where the court found that there was a materiality of contribution by. . . I looked long and hard at that for Mr. Wolters, or should I call him that? That doesn't surprise me, Your Honor. I'm bound to it as the law, however, at this point in time. So are we. And again. . . I have my chance. Well, we hope you don't take that chance here, Your Honor. We believe that the level of contribution of Fonavisa in providing a stall to sell goods and bringing in customers is far less than the level of contribution here where we have these defendants under the allegations, specifically funding each illicit transaction, the only source of funding for those transactions, with knowledge that they're infringing transactions. Can I ask you something here? I'm trying to understand the context of this lawsuit. Just in the cases that are before our court right now, I forget how many are involved where Perfect Ten is suing somebody based on some theory. What business is Perfect Ten trying to be in here? Is it in the lawsuit business? Are they trying to obtain a remedy? Are they looking for money? What are you looking for? Perfect Ten is a zealot advocate for the owners of copyrighted materials. They have spent millions of dollars legally acquiring and developing intellectual property, which they are prevented from selling at a profit because there are hundreds of websites operating out of nonexistent locations giving away their merchandise or selling it for pennies on the dollars. Is it representing just itself or is it representing a consortium of other people whose rights are likewise being infringed? No. This is a one-trick pony. This is someone who firmly believes in intellectual property and is spending the money to obtain justice. I'd like to reserve my last nine seconds for rebuttal, Your Honor. Thank you, Keith. Thank you. Good morning, Your Honors, and may it please the Court. I'm Andrew Bridges. I represent MasterCard International, Incorporated. I will address the copyright issues, perhaps the trademark issues briefly. Other counsel may address the state law issues as needed. First, actually, to answer the question Judge Smith asked earlier, I happen to represent Google also. I was in this court 19 days ago in Perfect Ten's case against Google. And, in fact, based on statements made in that case to answer the question of what Perfect Ten is after, I think the statements that Perfect Ten has made in that case calculate a damage claim of $1.65 billion against Google in that case alone. That used to be real money. That's right. And that's just one. Not anymore. That's right. But that's just one plaintiff. Perfect Ten does indeed propose a dangerous rule here that applied in the context of commerce as a whole, not just online commerce, would make every participant in a network of commerce, any participant that has the ability to affect any other. How about if you limited it to someone who took a percentage of the sale? Sorry, Your Honor. If you limited it to defendants who took a percentage of the sale. Yes, Your Honor. Your Honor, in that case, when Levi's sues Xenia for designing its jeans too close to Levi's jeans, then Stanford University is liable as a contributory or vicarious infringer because every mall in the country these days takes a percentage of retail of the retailers. There are many participants in commerce who have relationships that are based on percentage of sale. This is a transaction fee because money is being moved. Isn't this exactly the strategy that our government is using to shut down terrorist organizations and drug cartels? What we do is we say, look, it's very hard to get at these people. They're offshore. They're doing very dangerous things. And the way we do it is we go after the money. Because money is in banks. Money is in institutions that have a physical presence in the United States. So we shut them down. The way we shut them down is to stop the money. I don't see what's so unusual. This is a policy we are following. Our government is following. It seems like a wise one, too. You can't have commerce without banks. That's correct. I don't know that we want to endorse the government's policy on terrorism. We don't have to because we can travel without endorsing it. Are you suggesting that Visa is responsible in some way, Your Honor? Following the money is indeed a very good tactic. But the government, in trying to stop terrorism and following the money, has not used the common law rules of contributory liability and vicarious liability. It has used specific laws and regulations to follow the money. That's a difference. The government has more tools in dealing with a much more dangerous issue, and that is the safety of the country. Certainly, you would expect them to use more specialized tools. But what I'm pointing out is that the idea of going after the public commercial transaction that involves the return of money to the wrongdoer is not either particularly unusual or particularly creative. It is quite effective. It is something that I don't see what the real problem is with it. I mean, what if you had a website that was called fence.com and it said, you know, it had automobiles on there, and it said, you know, these were freshly stolen, and we can guarantee you that they have been taken out of the state where they were stolen. So, you know, if you drive them down the street, the original owner will not stock their own car. And you can use your visa, and after you buy it, somebody will drive it up to your front, quietly to your driveway, and leave it there with the key under the cut from the map. Well, Your Honor. Is that okay? Well, no, Your Honor. But if the plaintiff's theory holds, then to address that problem, we don't need police departments, and we don't need detectives, because we could just make the credit card networks liable and turn over to them. That, you know, we do need detectives. But we know that, you know, God helps those who help themselves, and the government will help those who help themselves. And we have, of course, we have the FTC to take care of consumer fraud, but we also rely on people to not do these things on common sense. There's a series of strategies we employ. So why don't you talk to me about that car that's now parked in my driveway, having been bought on fence.com, that they say this is their own car. You know, we guarantee delivery of a nice, their own vehicle, a fraction of what you'd have to pay in a dealership. That's right, Your Honor. Well, to begin with the principle that we would endorse, God helps those who help themselves, it would then be incumbent upon the claimant to take action against the wrongdoer, rather than enlisting a network of third parties who may have some commercial relationship. Are you going into business with the, in fence.com, or are you going to the heroin business? And you say, you know, order heroin and pay us, and we'll take a cut of the sale. Why aren't you participating in that sale? Well, the participation in the sale requires more than merely handling the financial aspects of the transaction. Otherwise everybody would be participating in the sale. Only if we say it does. I'm sorry? Only if we say it does. And you have to persuade us why that is a, why that is a, I mean, you are aware of the fact, I mean, let's make it more concrete. Let's say they're saying, look, we are bulgariancopyrightandinfringement.com. You know, why bother getting things from iTunes? You know, it costs you 99 cents a download. For a mere 9 cents a download, you can have anything you can get on iTunes from our service in Bulgaria, and, you know, why pay 10 times the cost by buying it legitimately when we have it here? And how do we have it? Well, we download it. We have no copyright. We don't have to, you know, pay an end user. So instead of cutting out the middleman, pay only the middleman. And Visa says, well, that sounds like a good business to us. We can make a lot of money this way. And if they want checks sent to Bulgaria, to the Bulgarian banks, who will be the Congress for it? You know, first of all, there's nothing in the complaint that is at issue in this case. I understand that. If you want to talk about how that this is, there will be liability, and that's different, we can talk about that. Right. But it is good that we are talking about copyright infringement liability as opposed to things like fencing because the Supreme Court has made it very clear in the Sony versus Universal City Studios case. So that would be okay, the Bulgarian copyright ripoff.com would be okay. Visa could do business with them. It could finance all of those downloads. The question under existing copyright law is would the defendant. I wish we had a yes or no. It would. Would it be okay? You can then explain at your heart's content to the end of your time your answer, but would that be Visa be legitimately entitled to do that and not be stopped? As a legal matter, yes, Your Honor. Whether it is morally the right thing to do or from a business standpoint the right thing to do is different, but under existing standards of contributory and proprietary. Why should we allow that? What is the utility in having businesses make profits from transactions that are illegal just because they happen to be done offshore? What is the utility to allow these rights to be violated so your client can make a lot of money? Why is it a good thing? Because the alternative, Your Honor, is to establish a regime that requires defendants upon a mere accusation by a copyright holder to have to undertake a vast amount of investigation to turn into investigator, prosecutor, judge, jury, and executioner. In a commercial context. That doesn't sound so bad. Isn't that what the DCMA, I don't know why I can't get those initials. DCMA. Well, Your Honor. Isn't that what's required of servers and the like? No, Your Honor. You're in the business. You get told, look, there's a server in Bulgaria. I shouldn't pick on Bulgaria. Let's pick some place we like. Let's pick Romania. Oh, Romania. Exactly. Kazakhstan is popular right now, Your Honor. Let's make it Romania. That sounds more like what they do. So they've got a server in Romania, and their business on their face is to sell infringing product. Your Honor, the question, as I understand it, was... And you then get a notice from Mr. King. King. Thank you. Here are the following places where the images are found. We notice there's a Visa transactional logo on the shopping basket. And we actually used our Visa card and were able to buy an image there, an infringing image. And we ask you to stop doing business with them, or at least force them to take off all these infringing images. What's so wrong about that for Visa? What's wrong is that Visa, or I'll speak about MasterCard, my particular client, has two options. The option is to create an entirely new business to investigate these allegations, mere accusations. Or the other option is to cut somebody off, to say, we can't get into the business of investigating because we handle millions of transactions per day for millions of merchants. That sounds like a business decision to me. Pretty good choice for you to make. We either want to get into this business, or we don't want to get into this business. And if we don't want to get into this business, it's like everything else. Don't you investigate businesses for legality? There is... Shop monography? For the full range of legality, Your Honor, I don't think that's done. I don't think it's capable. For example, does somebody have a business license? Does somebody not engage in employment discrimination? Or would it engage in criminal activity principles? What standards do you have for somebody signing up to be handled by MasterCard? The rules, first of all, the MasterCard and Visa networks have rules requiring their banks and processors to have certain underwriting standards to accept certain merchants. Most of those have to deal with the integrity of the financial network itself. The terms may allow termination for illegal conduct, but the persons working for Visa, MasterCard, excuse me, for the banks and the processors that actually have relationships with merchants don't have the legal degree and the full checklist of all the varieties of illegal conduct that may happen. What happens if they get a notice that a certain website that uses the MasterCard logo actually has child pornography? I'm sorry. I think there are special... There may be special regulations regarding child pornography. I'm not aware of the process there, Your Honor. But to take a parallel context... I wasn't asking about the regulations. I wasn't asking about the legal regime. Let me tell you for sure, free of legal advice here, it's legal. Oh, of course it's illegal. Okay, just so you're not under stigma. I understand that. Or they get a notice saying, you know, these people are selling heroin. Or these people are engaging in prosecution. Or they say, you know, you send us your Visa for $300 and we'll send the person of your preference to your home for sexual pleasure. I understand that, Your Honor. Those would be much easier cases than whether... I'm actually asking, what would they do? What would your client do if they get a notice like that? I believe in certain instances the networks and the banks, in fact, work with government to try to shut down flagrantly illegal businesses. So you're already in this business. We're only haggling about how much. The business, Your Honor, exists because of other regulations and other laws. You are here to persuade us that we ought not to put you in this additional business. We already know you are in this business. And the question is, should we extend this obligation to these particular transactions? Your job is to persuade us whether that's such a bad idea. And I have yet to hear anything that persuades me of that. Your Honor, the Supreme Court has spoken twice about caution for courts like this court in treading in the direction the court is speaking. For example... You know that around here we're very wary of the Supreme Court. I understand that. I understand that, Your Honor. And the Sony versus... But in the Sony versus Universal City Studios case, the court recognized for the first time the doctrine of contributory infringement liability. It indicated that it was a traditional form of liability that was being applied to copyright law. The Supreme Court was cautious in establishing and announcing the standards for that type of liability.  Anything more to expand the scope of copyright law is up to Congress, not the courts. And Congress heard that because over 50 times since that decision, Congress has amended the Copyright Act to cover new challenges. Mr. Bridges, you mentioned the Supreme Court. In connection with the vicarious copyright liability, the allegation in Mr. King's complaint is that by cutting off credit card transactions, you would inevitably put these other folks out of business. In the Grokster case, the Supreme Court's formulation for vicarious infringement was one, and I'm quoting, that infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it. How is this case distinguishable from that, then? Well, first, Your Honor, the Grokster decision did not extend to vicarious liability. It was decided on the basis of contributory liability only. Second, the Supreme Court. They've alleged both. Both were alleged, but the Supreme Court only took it and decided it. Here. That's right. And the vicarious ruling from this court stands after the Supreme Court's decision. I was vacated. Sorry. But it came back on the contributory decision, and it was not overruled on the vicarious decision. But the point, I take your point. But the Supreme Court in Meyer v. Holley analyzed a case of alleged vicarious liability in a Federal Housing Act context. Now, of course, that's a different statute. But the Supreme Court said. Not according to the analogy that Judge Kuczynski talked about. But the Supreme Court said in Meyer v. Holley, when a court is faced with a federal statutory tort, it is improper to expand the scope of vicarious liability without congressional authorization. Now, every vicarious liability case that this court has decided and that the Second Circuit decided, which this court invoked in Fonovisa, has involved the ability of the defendant, if kept in the vicarious theory, to affect the infringing conduct itself, not to have some ability to withdraw a business relationship in the hopes that that might have a secondary effect. But you've indicated in your responses to Judge Kuczynski and Judge Reinhart that you do, in fact, in the case of child pornography and other criminal activities, you do have that ability. You are in that business. No, Your Honor. The defendants in this case are not in the child pornography business. No, I don't mean that. I mean that you have the ability within your business to stop dealing with those kinds of merchants. I'm not suggesting you're in the child pornography business. That's right, Your Honor. But I am not aware of any court that has said. You also, just to follow up on Judge Smith's question, you also have the ability to go to a merchant who maybe does mostly legal business and say, by the way, you've got a bunch of child pornography on your website. You need to remove that if you want to keep doing business with us. You have that ability. That's right. That's right, Your Honor. So you not only stop simply doing business with them, you can actually affect content. No doubt about that. No, Your Honor. So how can you say that you don't have the ability? Why aren't you exactly in the Grokster situation? Well, a couple things. I need to leave time. I'm almost out of time. I need to leave time for other counsel to address some of the statewide issues, but I will answer your question. I don't think we need to do state court issues. They weren't argued by your opponents. Okay, that's fine, Your Honor. I'm happy to continue. And they were well briefed. Okay, thank you. I'll continue on this. Grokster and Napster and FonoVisa all stand in very different positions from the defendants in this case. Well, talk to me about FonoVisa. To me, this looks like the FonoVisa of cyberspace. No, Your Honor, because FonoVisa was virtually functioning as a – sorry, was functioning very, very closely with the infringers. It was promoting the event where the infringement occurred. And this case made it clear that – What about all those MasterCard commercials? Your Honor, if – They are designed to promote use of MasterCard in commerce. We all know what they say, right? For this, for that, there's MasterCard, everything else. That's right, Your Honor. Or maybe it's the other way around, but you know what they say. That's right. And everything else could include the things that are bought on these websites from Romania. Your Honor, if one of those ads said pictures of your daughter at the one-hour photo, $10, pictures from stolen Romanian websites, priceless or something like that, that would be a very different case. But that's not what's alleged here. Except for everything else, there's MasterCard. Yes, Your Honor. That's right. Except for those things which are priceless, it is saying, you know, you can use your MasterCard and all sorts of things. It doesn't – too numerous to list. Your Honor, clients like to make running jokes about lawyers in the mouse print and advertising. I guess we'll now have to have the last 30 seconds of the ad with all the mouse prints saying, this does not include Romanian websites with perfect 10 images. Maybe that's what drug manufacturers do if you want. I mean, that's a thin distinction in any event. How else are you different from FonoVisa? Well, because FonoVisa provided the actual instrumentality of copyright infringement. In that case, it was distribution of illegal copies on its premises and its promotion of that use. You can say that. Another way of saying it is they provided a parking lot. I'm not sure that a parking lot would have sufficed. Because – What else was there? The scans were brought in by the vendors. What they provided was a parking lot. And the ability to kick people out, that's what they really had. What they had was the ability to keep people out and kick people out if they didn't conform to the rules of the auction, of the free market. Your Honor, at 264, this court said that Cherry Auction did not just provide rental of space. It actively strived to provide the environment and the market for counterfeit recording sales to thrive. And the court said in 262 that it organized and promoted – organized and promoted and controlled customer access to the swap meet. The organization and promotion are critical here. And that – because if one steps back, contributory and vicarious liability are two different approaches to answering the same question, which is when is Person A responsible for the wrongs of Person B? In contributory infringement, it is when there is some sort of special conduct directed at causing infringement that creates contributory infringement liability. In vicarious liability, it is some particular relationship. Originally, it was respondent superior. And the Second Circuit addressed – it's respondent superior, maybe principal agent, but it doesn't reach other relationships like landlord-tenant. And in every case in this court, the relationship has been very, very close. Back in the Shapiro-Bernstein case, or maybe it was the Gershwin case, Second Circuit, the court there, which was followed by this court in Fonovisa and other vicarious cases, talked about an economic intertwining of interests that related to the infringement itself. And those facts just don't exist here, Your Honor. In short, what happens under a regime proposed by the plaintiffs here is that if the defendants are notified by the holder of the patent who sued BlackBerry that every singular wireless store, every T-Mobile store in the United States is selling BlackBerrys, and they infringe upon the plaintiff's patent, and therefore the defendants must drop every singular and T-Mobile store or else face liability for facilitating the sale of infringing patented devices. If any merchant with a gripe about any illegal conduct of any other merchant, and believe me, plenty of merchants gripe about the behavior of their competitors. It's called the Grenades of Horribles argument. Your Honor, and that... You know, we'll be here to stop it, trust me. Your Honor... And when that case comes along, we'll say, no, you're going to file it. This is the line doing what courts do all the time. This is why Mrs. Paul's graph lost. And, you know, the next plaintiff wins. It's because you have things all interconnected in life, and everything's connected to everything else, and courts have to draw a line. But this, what you're doing doesn't strike me as at all indirect. It strikes me that what your client is doing is getting a big chunk out of the illegal business. Your Honor, the client... Basically financing violation of copyright laws and, you know, making a nice profit out of it. Your Honor, the defendants in this case provide vast networks that allow an enormous amount of commerce of every stripe you want. There is nothing suggesting that these defendants are focused on infringement, are focused on perfect 10. Oh, they make money on everything, you know. We say, okay, you've got to not do it on stolen goods. And what's the big deal? And, Your Honor... And you police things in other ways, and this is going to be another way of policing it. We'll all share the cost. And the benefit to us all would be that we will then put a stop to theft. But, Your Honor... It would be a good thing. I would suggest, however, that the best candidate to begin this new process with is the electric company because it is the electric company's electrons and current that are actually responsible for the transmission. When we have that case, I will tell them you said so. I will say, go talk to Mr. Bridges. The reason you are here, unfortunately we have this case, unfortunately for your client, the case we have is your client's case.  Thank you, Your Honor. We'll give you a little time also to respond. Thank you, Your Honor. People always get into trouble under the buckle. Pardon me? People always get into trouble under the buckle. Oh, I'm not going to. In fact, I don't think you and I have anything to talk about. I'm perfectly pleased with you. That's because you don't know what I've got in mind. That's true, Your Honor. But I'll tell you one thing that the questions do indicate, and, you know, counsel on both sides have answers to some of them. We don't have answers to some of the others. It highlights that we're at the pleading stage of this case, where the plaintiffs are somewhat forced to make allegations which they legitimately believe to be true, but without the benefit to even understand the level of the investigation department at Visa and MasterCard. Why is this the kind of stuff Congress should take up? I mean, you've made a pretty good case, and I'm sure that, I mean, this is the kind of thing that congressional committees revel in. And why is this exactly the kind of thing that we should take? Like, if Congress wants to put this burden on the credit card industry, let them do it. I mean, you can go to Congress, you can come to the courts. We already have the laws of contributory vicarious liability for copyright infringement, and, you know, it's our position we don't need Congress to make a new law. I mean, again, listening to the questions on the phone of Visa case, you know, reminds me that we're talking about a situation where somebody invites customers, whether it's a parking lot or a building, and the auction company, I'm sorry, the swap-me company there had zero involvement with the infringing transactions, compared to the allegations here where you have the credit card companies sitting there under our allegations, looking at each transaction, approving transactions, those transactions, and providing the funds for those transactions. And more importantly, if the credit card companies exercise the rights they already have to control content and activity, they can effectively throw that merchant out from the entire world of Internet sales, as opposed to the phone-of-Visa swap-me, they can merely send them out of the swap-me, and they go to the swap-me down the street. So we have far more intimate involvement. So if phone-of-Visa is already the law, which of course it is, we believe our case is far more compelling than phone-of-Visa. And again, we're only at the... You're almost reading your reply brief. Well, I apologize, Your Honor. It was a good brief. I heard it, though, already. Well, I... You know what I think you guys ought to do? This is so close to lunchtime. We have such great restaurants here in Pasadena. I think you all, having heard the argument, ought to go to lunch and settle this case. That's what I think. I couldn't... I mean, as a lawyer, I would never disagree with that, Your Honor, but I'm not sure that that's what your opinion is going to read. But I'd love to have lunch in Pasadena, or look at me, any place, Your Honor. Does anybody over there have a credit card? Again, unless there are any other questions, I would just reiterate that the sustaining of the lower court's decision is really a grant of immunity to credit card companies for any sort of secondary liability, again, without the chance to develop the record any further. I'm going to stop there somewhere. I'll just carry it right there. Okay, very good. Thank you, Your Honor. Period. The case just argued will be submitted. And now, for a change, we'll have Perfect Ten against C.C. Bill, LLC.
judges: Reinhardt, Kozinski, Smith